IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL JEFFREY FIERRO, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ANDREW M. SAUL, )<br>Commissioner of the Social )<br>Security Administration,[1] )<br>)<br>Defendant. ) | No. 17 C 3449<br><br>Judge John Z. Lee |

**MEMORANDUM OPINION AND ORDER**

Daniel Jeffrey Fierro seeks review of a final decision by the Commissioner of the Social Security Administration denying his application for disability insurance benefits. The parties have filed cross motions for summary judgment. For the following reasons, the Court grants Fierro's motion, denies the Commissioner's cross motion, reverses the Commissioner's decision, and remands this case for further proceedings consistent with this Memorandum Opinion and Order.

I. **Procedural History**

Fierro applied for disability insurance benefits, claiming that he has been disabled since June 2011 as a result of depression, lack of short-term memory, and a learning disability. Administrative Record ("R.") 17, 23, ECF No. 9. His application

---

[1] The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

was denied, and Fierro sought a hearing, which took place in October 2015. *Id*. 17. Just over a month later, the Administrative Law Judge ("the ALJ") issued a decision denying Fierro's claim. *Id*. 17–27. The Appeals Council declined to review the decision, making the ALJ's denial of benefits the final decision of the Commissioner and subject to judicial review. *Id*. 1; *see* 20 C.F.R. § 416.1481.

## II. Factual Background

Fierro was born on February 4, 1983, and was thirty-two years old at the time of the October 2015 hearing. Pl.'s Mem. Supp. Summ. J. ("Pl.'s Mem.") 3. After graduating from high school, where he had qualified for special-education classes, Fierro attempted, but did not complete, junior college. R. 312.

Fierro estimates that he has held thirty to forty jobs over the years, mostly through temporary staffing agencies. Pl.'s Mem. at 3. One of those jobs involved working as a custodian for two months in 2015. *Id*. 53. Fierro was fired because, according to his supervisor, he "could not perform his duties as assigned," "could not stay on task," "could not follow clear directions," and "could not keep the pace or the schedule given to him." *Id*. 283.

### A. Medical Evidence

In April 2004, Fierro was admitted to the psychiatric unit of Provena Saint Joseph Medical Center in Joliet, Illinois, where he was examined by psychiatrist Dr. Elsy Devassy. R. 350–51. Saint Joseph's medical records state that Fierro was admitted "because of disorganized thinking, depression, and suicidal thoughts," and because he was incapable of caring for himself due to his "confusion and altered

2

mental status." *Id.* 348. In addition, the records indicate that Fierro was experiencing delusions, such as thinking family members were in the house when they were not.[2] *Id.* 344. To date, Fierro has continued to be treated by Dr. Devassy once every one or two months. *Id.* 379.

Dr. Devassy completed a mental impairment evaluation in connection with Fierro's application for disability insurance benefits. *Id.* 378–85. She wrote that Fierro was "doing fair," but "[s]till ha[d] difficulty with his concentration and organization." *Id.* 379. He was taking 20 mg of Lexapro, 10 mg of Brintellix, and 200 mg of Seroquel. His prognosis was "poor." *Id.* 379. Devassy noted Fierro's mood disturbance, difficulty thinking or concentrating, paranoid thinking, and easy distractibility, among other symptoms. *Id.* 380.

Regarding Fierro's ability to perform unskilled work, Devassy found that Fierro was "unable to meet competitive standards" because he could not maintain attention for two-hour segments. *Id.* 381. She also noted that Fierro was "seriously limited" in his ability to maintain regular attendance and be punctual; make simply work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. *Id.*

Turning to Fierro's ability to perform semi-skilled or skilled work, Devassy observed that Fierro was "seriously limited" in his ability to understand and remember detailed instructions; carry out detailed instructions; set realistic goals or

---

[2] In his application for social security benefits, Fierro stated that he did not remember anything about his psychotic breakdown. *Id.* 255.

3

make plans independent of others; and deal with the stress of semiskilled and skilled work. *Id.* 382.

Assessing Fierro's functional limitations, Devassy concluded that Fierro had no or mild restriction of activities of daily living; exhibited moderate difficulties in maintaining social functioning; displayed marked difficulties in maintaining concentration, persistence, or pace; and experienced one or two episodes of decompensation within a twelve-month period, each of which lasted at least two weeks. *Id.* 383. Furthermore, Fierro had shown "such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [him] to decompensate." *Id.* 384. Devassy expected that Fierro would be absent from work more than four days a month and wrote that he "cannot function under the stress of normal work demands." *Id.* 384.

Dr. John Brauer, a consultative clinical psychologist, also examined Fierro. *Id.* 362–66. After a fifty-minute interview, he found that Fierro was "alert, calm and oriented regarding identity and circumstances and was cooperative with the entire evaluation process," but was "poorly oriented to time," thinking that it was 2014 rather than 2013. *Id.* 363. Moreover, according to Brauer, Fierro told him that he had been hospitalized for severe depression about four years prior to the interview; in fact, Fierro was hospitalized in 2004, ten years prior to the interview. *Id.* 363.

Over the course of the interview, Dr. Brauer also performed various intelligence tests and concluded that Fierro was in the 95th percentile for perceptual reasoning, the 37th for working memory, the 19th for verbal comprehension, and the

4

2nd for processing speed, establishing a "full scale" intelligence score in the 34th percentile. *Id.* 364. Additionally, Dr. Brauer found Fierro's concentration and attention to be "within normal limits." *Id.* 363–65. He concluded that Fierro's "slow processing combined with an 'eagerness to please'" resulted in Fierro "trying to get on with the task before hearing all the instructions." *Id.* 366. Bauer also noted that Fierro had denied any history of delusions or suicidal ideation, and, in the end, diagnosed Fierro with major depression and a learning disability. *Id.* 363–64.

**B.    Hearing Testimony**

During the hearing before the ALJ, Fierro stated that he was employed at a McDonald's restaurant, where he worked two days a week cleaning the fryers, sweeping, mopping, and restocking ingredients. *Id.* 37–38. Fierro had requested that he be trained to work at the grill station, but he was awaiting a response. *Id.* 39. He testified that his supervisor "expects [him] to do ten things at a time and it's not possible." *Id.* 52. He explained that, when his supervisor gives him one task to do, he's "fine focusing on it," but if he is instructed to do one task and then another, it takes him twenty minutes to change tasks or to learn how to do the next task. *Id.* 49.

Fierro recalled that, at a previous job, he was required to drive a forklift and scan various products. *Id.* 46–47. He found scanning the products difficult, especially when he had to type in a ten-digit number. *Id.* He broke his leg during that job, but he could not remember the details of how that happened. *Id.* 46, 51–52.

Fierro also testified that, at home, he cares for his infant son in the mornings. *Id.* 42. He also vacuums, prepares meals for himself, and does the dishes and laundry.

5

*Id.* He occasionally goes shopping by himself. *Id.* 43. He travels regularly to his mother's house to help care for his grandfather by assisting him with showering, and "[a] lot of times" his mother calls to remind him. *Id.* 49, 58.

Fierro's mother, Lynn, also testified during the hearing. She stated that she and her husband helped Fierro, his wife, and their infant son "quite a bit financially and even emotionally." *Id.* 64. For example, Lynn cared for her grandson when Fierro was working. *Id.* When Fierro was not working, he would come to her house and do chores for her while she cared for the baby.³ *Id.* 64. Lynn observed that Fierro sometimes had trouble with the chores she gave him. *Id.* 68. For example, he needed help changing bed sheets because he had become confused by the fact that the sheets were longer than they were wide. *Id.*

Although Fierro had testified that it did not take him long to get the McDonald's job, Lynn testified that Fierro got the job only after working with a rehabilitation counselor at the Department of Human Services for three years. *Id.* 65–66. A representative from an agency called Helping Hands filled out Fierro's applications for him, drove him to McDonald's, and helped him during the interview. *Id.* 66. According to Lynn, although Fierro asks his manager for more hours, his manager feels he cannot handle more than 20 to 25 hours a week. *Id.* 67. Lynn also stated that her son "has trouble all the time" at McDonald's, and that, on one occasion, he quit on the spot when his manager became frustrated with him. And he was

---

³ Lynn stated that, although her son has been left alone with his infant son, it has been for no more than two-and-a-half hours. *Id.* 70–71.

6

allowed to return only after Fierro's wife, who works at the same McDonald's, was able to smooth things over. *Id.* 67.[4]

As for Fierro's former job as a forklift driver, Lynn recalled that Fierro broke his leg while driving a forklift in an attempt to meet his supervisor's demand that he work faster. *Id.*

Thomas Dunleavy, a vocational expert, also testified at the hearing as an impartial witness. *Id.* 72–73. The ALJ asked Dunleavy several hypothetical questions regarding a person of Fierro's age with the same education, work experience, and skill set, and with no exertional limitations. *Id.* 74–78. For the first hypothetical, the ALJ posited a person who could only work in jobs limited to simple, routine, repetitive tasks performed in an environment free of fast-paced production requirements, involving only simple work-related decisions, and with few, if any, workplace changes. *Id.* 74. Dunleavy testified that such a person could perform jobs that exist in the national economy, including housekeeping cleaners, laundry laborers, and transportation cleaners. *Id.* 75. As for Fierro's past work, Dunleavy testified that a person with his limitations could be a kitchen helper, but Dunleavy would be "concerned" about stock work and driving a forklift would "certainly not" be an option. *Id.* 74.

In the second hypothetical, the ALJ incorporated the same limitations as the first, but included a requirement that the person needed to be reminded of tasks twice

---

[4] When Fierro's attorney asked him whether he had ever walked off during the middle of his shift at McDonald's, he answered that he had not. *Id.* 53.

a day. Dunleavy testified that such a person could perform the jobs Dunleavy had previously identified. *Id.* 75–76.

The ALJ next asked whether a person that could only work in low-stress jobs with no decision-making required, no changes in work setting, and no strict production rate requirements could work at an existing job. *Id.* 76–77. Again, Dunleavy testified that such a person could perform jobs that exist in the national economy. *Id.* 77–78.

For the final hypothetical, the ALJ presented a person who could only perform simple, routine, repetitive tasks, performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions with few, if any, workplace changes, and requiring close supervision, defined as having a surprise check on the person's work twice a day. *Id.* 78. Dunleavy stated that such a person could perform the three jobs he previously identified. *Id.* 78.

During cross-examination, Fierro's attorney asked Dunleavy whether a person, who was unable to maintain attention for a two-hour stretch (as Devassy had described Fierro), could perform an existing job. *Id.* 79. Dunleavy stated that such a person would be unable to do any of Fierro's past work and would be precluded from competitive employment. *Id.* 79–80.

Counsel for Fierro next asked Dunleavy about his sources and methodology. Dunleavy answered that he used the Dictionary of Occupational Titles (published in 1991), the Bureau of Labor Statistics, and county business patterns from the Census Bureau (published in 2013). *Id.* 82–87. He determined how many jobs existed in a

8

certain occupational employment statistics ("OES") category, then divided that by the percentage that were full-time according to the Census Bureau. *Id.* 83. From there he applied his experience to estimate how many of those full-time jobs were compatible with a person with particular attributes and restrictions. *Id.* 83.

By way of illustration, he noted that 929,000 jobs existed in the United States under the OES code that included housekeeping cleaners. *Id.* 83. This code covered nine occupations. And, according to the Census Bureau, 59% of those, or 464,000, were full-time. *Id.* 83.[5] Dunleavy stated that in his opinion, 50% of those were "within the housekeeping cleaner part." *Id.* 83.

Counsel asked how Dunleavy determined what percentage of the occupations within an OES category were relevant jobs for the purposes of his analysis, and Dunleavy testified that he used his experience and his knowledge of jobs to determine that figure. *Id.* 85. Counsel further asked whether Dunleavy could produce a document containing his analysis, and Dunleavy replied that he could not. *Id.* 83–84. Counsel then stipulated to Dunleavy's qualifications, but objected to Dunleavy's conclusions, and the ALJ noted that objection. *Id.* 87.

## C.   The ALJ's Decision

The ALJ issued his decision on December 1, 2015. *Id.* 17–27. The ALJ found that, while Fierro's depression and learning disorder were severe impairments, they did not "meet or medically equal" one of the listed impairments described in the regulations. *Id.* 20. The ALJ determined that Fierro experienced mild restrictions

---

[5] This calculation is incorrect, but it is not clear from the record whether the mistake was by Dunleavy or is a transcription error.

9

as to activities of daily living; mild difficulties in social functioning; and moderate difficulties (helped by medication) in the areas of concentration, persistence, and pace. *Id.* 21. The ALJ also concluded that Fierro had experienced one to two episodes of decompensation, each of extended duration, but found "[n]o evidence that even a minimal increase in mental demands or change in the environment would be predicted to cause [Fierro] to decompensate." *Id.* 21–22. Because this did not amount to at least two "marked" restrictions or one "marked" restriction plus "repeated" episodes of extended decompensation, the ALJ determined that Fierro did not meet or medically equal an impairment under Listing 12.05 for intellectual disorders. *Id.* 21.

Next, the ALJ determined that Fierro had the residual functional capacity to work at all exertional levels, with non-exertional limitations to account for his impairments. *Id.* 22. The ALJ gave "great weight" to the opinions of State agency physicians and Brauer. *Id.* 25. By contrast, the ALJ gave "little weight" to Devassy's opinion, because her conclusion that Fierro had difficulty concentrating "is contrary to the treatment notes as well as [Fierro's] own testimony that medication helped him concentrate." *Id.* 26. The ALJ did not provide any additional analysis or explanation regarding the weight (or lack thereof) that he gave to Devassy's opinions. The ALJ quoted from portions of Devassy's treatment records that noted that Fierro has occasionally stated that he was "feeling good," "feeling ok," or "feeling a little better." *Id.* 24.

10

Finally, the ALJ relied on Dunleavy's testimony to find that given Fierro's age, education, work experience, and residual functional capacity, in addition to his non-exertional limitations, he could perform jobs that exist in significant numbers in the national economy. *Id.* 26–27. Based on these findings, the ALJ concluded that Fierro was not disabled. *Id.* 27. The Appeals Council declined to review the decision. *Id.*

### III. Legal Standards

#### A. Standard of Review

In reviewing a final decision on disability benefits, a court will reverse the decision only if it is not supported by substantial evidence or is based on an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if reasonable minds could differ. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (internal quotation marks omitted). An ALJ must "build an accurate and logical bridge from the evidence to her conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal quotation marks omitted).

#### B. Standard for Finding Disability

Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). The ALJ must consider the following questions in five

11

sequential steps. First, has the claimant performed any substantial gainful activity during the period for which he claims disability? Second, does the claimant have a severe impairment or combination of impairments? Third, does that impairment meet or medically equal one of a list of impairments described in the regulations? Fourth, does the claimant retain the residual functional capacity ("RFC") to perform his past relevant work? Fifth, is the claimant able to perform any other work existing in significant numbers in the national economy? *See* 20 C.F.R. § 416.920(a)(4).

## IV. Analysis

Although the ALJ found Fierro's impairments to be severe (step two), the ALJ determined that Fierro's impairments did not meet or medically equal the listed impairments (step three) and that Fierro had the residual functional capacity ("RFC") to perform jobs that existed in significant numbers in the national economy (step five). R. 20, 22, 26. The Commissioner argues that each of these determinations was supported by substantial evidence and should be affirmed. Fierro disagrees, contending that the ALJ failed to identify a proper basis for his conclusions.

Fierro's primary argument is that the ALJ gave "little weight" to the assessment of his treating physician, Devassy, without sufficiently explaining his reasons. Pl.'s Mem. at 11–13. The Court agrees.

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2). An

12

ALJ who does not give the treating physician's opinion controlling weight must offer "good reasons" for declining to do so. *Larson*, 615 F.3d at 749.

First, the ALJ did not supply a good reason for declining to give Devassy's opinion controlling weight. The entirety of ALJ's analysis is as follows:

> I give little weight to the opinion of treating physician Dr. Devassy. Dr. Devassy opined that the claimant had moderate difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, or pace. Dr. Devassy further opined that the claimant would miss more than four days of work per month and that he was seriously limited or unable to meet competitive standards in many mental abilities and aptitudes needed to do unskilled work, semiskilled or skilled work. Overall, this opinion is given no weight because it is contrary to the treatment records. Dr. Devassy stated that the claimant had difficulty with his concentration, which is contrary to the treatment notes as well as his own testimony that medication helped him concentrate.

R. 25–26 (internal citations omitted).

The only reason the ALJ offered for ignoring Devassy's assessment is that it was contrary to her treatment notes that reflected Fierro's statements that his medication had helped him concentrate.[6] *Id.* 26. But the ALJ does not explain why Fierro's self-reported improved concentration wholly negates his treating physician's evaluation that, even while taking his medication, Fierro "[s]till ha[d] difficulty with his concentration and organization" and exhibited "easy distractibility." *Id.* 379–80. The ALJ's reliance on Fierro's recollection of his own capabilities is especially

---

[6] The ALJ asked Fierro how his medication was working, and Fierro replied, "[i]t works fine. Pretty much a pill that I take every day, so." R. 50. The ALJ followed up by asking whether Fierro thought he was improving, and Fierro answered, "[i]t's pretty much just pills to help me keep my mind focused, so." *Id.*

13

troublesome, in light of Fierro's documented deficiencies in memory. *See id.* 364. As discussed above, Fierro either misremembered or could not remember various significant events. For example, he could not remember anything about his psychiatric breakdown, including the year in which it occurred; he could not remember how he broke his leg while driving a forklift; and he did not remember walking off the job at McDonald's, though his mother testified that he had.

Second, even if the ALJ had provided good reasons for discounting Devassy's opinion, he was required to consider a checklist of factors in determining precisely how much weight he should give it. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); 20 C.F.R. § 404.1527(c))*; see also Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Those factors include "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson*, 615 F.3d at 751. The ALJ failed to address any of these factors.

What is more, consideration of those factors likely would have supported giving substantially more weight to Devassy's opinion. At the time of Fierro's application for benefits, Devassy had seen him every month or two months over the course of a decade. R. 379. As a psychiatrist, her specialty was clearly related to Fierro's alleged disability of "severe mental impairments." Pl.'s Mem. at 3. And her findings have remained consistent throughout his course of treatment. *Id.*

Thus, the Court concludes that the ALJ failed to "build a logical bridge" from evidence in the record to his conclusion. *See Steele*, 290 F.3d at 941. Nor was this

14

error harmless, as Devassy's assessment was relevant to at least two of the steps in the disability analysis.

For example, while the ALJ concluded that Fierro had only a "moderate" limitation for maintaining concentration, persistence, or pace, Devassy considered the limitation "marked." R. 21, 383. Furthermore, while ALJ found that there was "no evidence" that a minimal increase in mental demands or change in the environment would cause Fierro to decompensate, Devassy had reached the opposite conclusion. R. 21–22, 384. These determinations are relevant to the step-three inquiry.

The ALJ's error also affected his conclusion in step five. When the ALJ determined Fierro's RFC, he gave no weight to Devassy's opinion that Fierro was unable to meet competitive standards in many areas necessary to do unskilled work and that Fierro would miss more than four days of work per month. R. 26. Nor did he explain why. *Id.* Indeed, Devassy had concluded that Fierro was incapable of maintaining attention for two hours, and the vocational expert had testified that such a restriction would preclude competitive employment. R. 79, 381.

Accordingly, the ALJ's failure to support his conclusions with substantial evidence requires the Court to remand the case for further consideration. *See, e.g., Campbell*, 627 F.3d at 306–10 (remanding case because ALJ did not adequately consider the assessment of the treating physician). Given that remand is warranted, the Court need not address Fierro's other arguments.

Before concluding, however, it is worth noting that Fierro's criticism of the vocational expert's methodology echoes concerns voiced by the Seventh Circuit. *See, e.g., Forsythe v. Colvin*, 813 F.3d 677 at 680–81 (7th Cir. 2016); *see also McKay v. Colvin*, 2016 WL 6432582 at *8–9 (N.D. Ill. Oct. 31, 2016) (collecting cases in which the Seventh Circuit has raised doubts about the reliability of vocational evidence). Here, Fierro's counsel objected to the numerical calculations offered by Dunleavy on the grounds that Dunleavy was unable to explain or even document his "modifications" to the numbers from census data. Without revealing his specific methodology, Dunleavy stated that he had used his expertise to estimate how many jobs of the relevant type existed based on broader data. R. 83; *see Forsythe*, 813 F.3d at 681 ("Often the vocational expert simply divides the census data . . . in the broad category . . . by the total number of narrow categories in the broad category, thus assuming that each narrow category has the same number of jobs—an unwarranted assumption."). On remand, any vocational expert should be prepared to provide a more substantive basis for his or her opinions.

## V.    <u>Conclusion</u>

For the above reasons, the Court grants Fierro's motion for summary judgment, denies the Commissioner's cross motion, reverses the Commissioner's decision, and, pursuant to the fourth sentence of 42 U.S.C. § 405(g), remands for further proceedings consistent with this Memorandum Opinion and Order. This case is terminated.

**IT IS SO ORDERED**                            **ENTERED: 3/10/21**

*/s/ John Z. Lee*

_____

**JOHN Z. LEE**
**United States District Judge**